UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| TAMMY LYNN HUTSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:20 CV 841 RWS |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| Commissioner of | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant.[1] | ) | |

## MEMORANDUM AND ORDER

Plaintiff Tammy Lynn Hutson ("Hutson") brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the Social Security Commissioner's ("Commissioner") decision to deny her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") benefits.  For the reasons explained below, I must affirm the decision.

## PROCEDURAL HISTORY

Hutson filed a Title II application for disability insurance benefits and a Title XVI application for supplemental security income on August 17, 2017. The claims

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted, therefore, for Andrew Saul as the defendant in this suit.  No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

were initially denied on October 25, 2017 and after reconsideration, denied again. Hutson filed a timely request for a hearing, which was held on March 26, 2019.  The ALJ issued his decision on June 6, 2019, finding that Hutson was not entitled to any benefits.  Hutson appealed and the Appeals Council denied her request for review. Hutson then filed this case seeking judicial review of the Commissioner's decision.

In this action for judicial review, Hutson argues that the ALJ did not adequately consider her subjective pain complaints and that the residual functional capacity ("RFC") he formulated was unsupported by medical evidence in the record.

## LEGAL STANDARD

To be eligible for disability insurance benefits under the Social Security Act, a plaintiff must prove that she is disabled.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Sec'y of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992).  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which

exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

In determining whether a claimant is disabled, the Commissioner conducts a five-step analysis.  See 20 C.F.R. § 404.1520; Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009).  The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity.  If the claimant is working, disability benefits are denied.  Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities.  If the claimant's impairment(s) is not severe, then she is not disabled.  The Commissioner then determines whether the claimant's impairment(s) meets or equals one of the impairments listed in 20 C.F.R., Part 404, Subpart P, Appendix 1.  If the claimant's impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled.  At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work. If so, the claimant is not disabled.  Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the national economy.  If not, the claimant is declared disabled and is entitled to disability benefits.

In reviewing the ALJ's denial of Social Security disability benefits, my role is limited to determining whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record

as a whole.  <u>Pate-Fires</u>, 564 F.3d at 942.  "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  <u>Id.</u>  In determining whether the evidence is substantial, I must consider evidence that both supports and detracts from the Commissioner's decision.  <u>Id.</u>  I must "defer heavily to the findings and conclusions of the Social Security Administration."  <u>Hurd v. Astrue</u>, 621 F.3d 734, 738 (8th Cir. 2010) (internal citation omitted).  I may not reverse a decision that is supported by substantial evidence in the record, even if substantial evidence in the record supports a contrary outcome, or if I would have decided the case differently in the first instance.  <u>Johnson v. Astrue</u>, 628 F.3d 991, 992 (8th Cir. 2011).

## ADMINISTRATIVE RECORD

With respect to the medical records and other evidence of record, I adopt Hutson's recitation of facts set forth in her Statement of Uncontroverted Material Facts, to the extent that they do not directly conflict with the Commissioner's Statement of Uncontroverted Material Facts and are supported by the record. Specific facts will be discussed as needed to address the parties' arguments.

The medical records in this case date back to August 5, 2015, when Hutson had a CT scan of her chest, which revealed minimal apical pleural thickening, T8 compression fracture ("most likely chronic"), and possibility of hydronephrosis, especially on the left side.  (Tr. 271.)  She was diagnosed with acute colitis during

an emergency room visit on October 8, 2015, after a CT scan of her abdomen and pelvis revealed mild transverse and left colitis and bilateral intrarenal calculi measuring up to 8 mm on the left and 4 mm on the right.  (Tr. 392-93.)  She received prescriptions for Flagyl, Cipro, Norco, and Phenergan and was instructed to follow up with her primary care physician.  (Tr. 394.)  A few days later, she visited Dr. Sequita Morris, who addressed Hutson's abdominal pain as well as ear pain.  (Tr. 281.)   Dr. Morris noted that Hutson "cannot afford a colonoscopy, but if [pain continues] then she really does need one."  (Tr. 281.)

Hutson visited the emergency room again on December 22, 2015, presenting with more complaints of abdominal cramping and blood in her stool, plus complaints of nasal congestion, a cough, and facial pain.  (Tr. 362.)  A CT scan of her abdomen and pelvis revealed mild fatty liver, bilateral non-obstructing stable renal calculi and congenital extrarenal pelvis.  (Tr. 375.)  She was diagnosed with a cough, an upper respiratory infection, and abdominal pain, and directed to follow up for a colonoscopy.  (Tr. 378.)

On March 22, 2016, Hutson saw Dr. Rafael Figueroa-Dugarte for her abdominal pain.  He noted that her October CAT scan showed left-sided colitis but that her most recent CAT scan demonstrated it had "completely resolve[d]."  (Tr. 273.)  He also recommended that she get a colonoscopy.  (Tr. 273.)  Her other physical and psychiatric exams all revealed normal results.  (Tr. 275.)

Hutson also made three emergency room visits in 2016, reporting urinary frequency, burning, and pain in June (Tr. 349); lower back and abdominal pain in October (Tr. 330); and ear pain, rectal bleeding, pelvic cramping, and occasional diarrhea in November. (Tr. 314, 318.)  On each occasion, she rated her pain as an 8 out of 10.  (Tr. 349, 331, 315.)  Her other exams at these appointments, including psychiatric exams, were normal.  (Tr. 353, 332, 318-19.)  She was advised that "she may be developing pyelonephritis based on the pain in her back and positive urinalysis" (Tr. 359-60) and was prescribed Cipro at all three appointments. (Tr. 359-60, 344-45, 326.)  She was also prescribed Ultram in June (Tr. 359-60), and Flagyl, Sudafed, Flonase, and Percocet in November.  (Tr. 326.)   Another CT scan of her abdomen and pelvis in November revealed indications of mild colitis, pelvic vascular congestion syndrome, bilateral nonobstructing calyceal renal calculi, bilateral physiological ovarian cysts, and fatty liver.  (Tr. 324.)

Huston visited the emergency room twice in 2017.  On July 3, she reported pain in her right side, vomiting, and epigastric and right upper quadrant abdominal discomfort on and off for the past month.  (Tr. 298, 302.)  She rated her pain as a 7 out of 10.  (Tr. 299.)  She received Zofran, morphine sulfate, and Protonix while in the hospital and was prescribed Prilosec, Zofran, and Ultram when discharged.  (Tr. 300, 310.)  She was also instructed to follow up with her primary care physician. (Tr. 309.)  On September 24, she went to the emergency room again, this time with

complaints of urinary frequency, burning, and pain.  (Tr. 399.)  She was given Zofran; diagnosed with a UTI; prescribed amoxicillin, Zofran, and Ultram; and instructed to follow up with her primary care physician. (Tr. 401, 404, 405.)

On October 11, 2017, Hutson saw Dr. Barry Burchett for a consultative exam.[2] (Tr. 409.)  He diagnosed her with chronic cervicalgia, possible IBS, chronic pelvic pain, and history of recurrent UTI.  (Tr. 412.)  During that visit, Dr. Burchett discussed her history of neck pain and pelvic congestion, noting that she had not followed up with any providers for her neck pain since a CT scan of her neck in November 2015, and also had not pursued physical therapy or chiropractic treatments.  (Tr. 409.)  He described her issues with constipation and abdominal pain, noting that she had "never seen a gastroenterologist or had a scope of her belly," nor seen a gynecologist.  (Tr. 409-10.)  She walked with a "normal gait," "appears stable at station and comfortable in the supine and sitting positions," and exhibited an "appropriate" appearance, mood, and orientation.  (Tr. 410.)  She could walk on her heels and toes, "perform tandem gait without difficulty," and squat up until 85 degrees of knee flexion before complaining of lower back discomfort.  (Tr. 412.)  All of her range of motion values were normal.  (Tr. 412-15.)

---

[2] This exam was scheduled after Dr. Janna Crosnoe evaluated Hutson's records at the initial level and concluded that there was not sufficient evidence to support a decision on her claim.  (Tr. 75.) After reviewing Dr. Burchett's findings with the rest of the record, Dr. Crosnoe opined that Hutson did not suffer from any severe impairments and did not have any significant functional limitations. (Tr. 76.)

In 2018, Hutson made two more emergency room visits.  In January, she sought treatment for a kidney infection, bladder cramping, shooting pain on the right side of her body, and nipple discharge, rating her pain as an 8 out of 10.  (Tr. 542.) She had a CT scan of her kidneys, ureters, and bladder, which revealed prominence of the extrarenal pelvis on both the left and right sides and non-obstructing calculi in the left and right kidney.  (Tr. 550.)  She was diagnosed with flank, abdominal, and nipple pain and instructed to follow up with her primary care physician before being discharged with prescriptions for Norco and Zofran.  (Tr. 552-53.)   In May, Hutson visited the emergency room again, this time for rectal bleeding, abdominal pain, intermittent diarrhea with constipation, nausea, and back pain.  (Tr. 693-94.) Her exams, including the psychiatric exam, yielded normal results.  (Tr. 697-98.) She was referred for a colonoscopy, which revealed non-bleeding internal hemorrhoids.  (Tr. 699.)  She also underwent an upper GI endoscopy, which revealed a small hiatal hernia, non-severe esophagitis, gastritis, and non-bleeding gastric ulcers.  (Tr. 700.)  Based on these results, she was discharged with instructions to follow an anti-reflux regimen and a GERD/peptic ulcer disease diet and avoid non-steroidal anti-inflammatory drugs and tobacco.  (Tr. 700.)

In March 2018, Hutson had an ultrasound of her abdomen, which showed mild prominence of the renal pelvis bilaterally, similar to what was observed on her 2 prior CT scans (Tr. 805), as well as a transabdominal and transvaginal ultrasound of

her pelvis, which showed a 2.7 cm posterior fundal uterine myometrial leiomyoma. (Tr. 779.)  In April, she had an X-ray of her cervical spine, which revealed cervical spondylosis and mild to moderate narrowing of the C5-C6 intervertebral disc space, with mild disc space narrowing at C4-C5 and C6-C7, and mild inferior face arthrosis. (Tr. 774.)  She also had an X-ray of her lumbar spine, which showed mild lumbar spondylosis at L3-L4, persistent bilateral intrarenal calculi, and possible inflammatory right sacroiliitis (Tr. 776).  Nuclear medicine hepatobiliary imaging revealed patency of the common bile duct and cystic duct with ejection fraction at 49.7%, "which is normal."  (Tr. 771-72.)

Throughout 2018 and 2019, Hutson had several appointments with Dr. Rustico Ramos at the Saint Francis Medical Center.  (Tr. 430, 465, 482, 505.)  Most of these visits addressed her back pain.  Dr. Ramos diagnosed her with chronic bilateral low back pain without sciatica, tobacco abuse, GERD with esophagitis, chronic superficial gastritis without bleeding, acquired hypothyroidism, family history of early CAD, family history of colon cancer, and history of domestic physical abuse in an adult.  (Tr. 332-33.)  He prescribed levothyroxine, ranitidine, buspirone, and venlafaxine.  (Tr. 433.)  An X-ray of her lumbar spine revealed "mild S-shaped curvature involving the lower thoracic and lumbar spine."  (Tr. 426.)  Dr. Ramos ordered an MRI of Hutson's lumbar spine to evaluate for discogenic disease on December 10, 2018.  (Tr. 466.)  He also noted that her insurance would not cover

physical therapy.  (Tr. 466.)  On January 7, 2019, he referred her to a urologist because of her history of urinary tract infections.  (Tr. 482.)  He also noted that the MRI revealed a normal lumbar spine and bilateral hydronephrosis, which was more severe on the left side than the right.  (Tr. 482, 996.)  On February 14, 2019, he diagnosed her with fibromyalgia and prescribed duloxetine and gabapentin.  (Tr. 507.)  He also ordered an X-ray after she complained of pain in her right knee.  (Tr. 507.)  She reported anxiety and difficulty sleeping.  (Tr. 505.)

Hutson began seeking mental health treatment in 2018.  She had numerous appointments with her caseworker, Mackenzie Couch, who discussed Hutson's health with her, drove her to various appointments, and helped her with various tasks, including accessing a food bank.  (Tr. 864-943.)  On September 21, 2018, she underwent a psychosocial clinical assessment with a counselor, Tonya Mills.  (Tr. 941.)  Hutson discussed her sleeping problems, depression, anxiety, and stress.  (Tr. 943.)  She reported being able to make and keep appointments; maintain her own living space; communicate well with others; take her medication; care for her pets; maintain her home; plan and prepare her own meals; do her own grocery shopping; engage in hobbies such as sewing, reading, and playing with dogs; and maintain several friendships.  (Tr. 945-52.)

Hutson saw Quentin Chambers, MSN on October 19, 2018, reporting "a lot of anxiety…still a little depressed."  (Tr. 958.)  She also reported trouble sleeping.

(Tr. 961.)  However, overall, she concluded that she was "doing a little bit better."
(Tr. 962.)  Her exams all yielded normal results, and Mr. Chambers noted that she
appeared to be goal directed and logical, with fair to good insight and judgment.  (Tr.
962.)  He diagnosed her with bipolar mixed episodes without psychotic features and
chronic PTSD.  (Tr. 962.)  Hutson also saw Mr. Chambers on December 21, 2018.
She said she was still having trouble managing her anxiety and reported that the
Zaleplon he had previously prescribed made her have nightmares. (Tr. 963, 967.)
She stated that she was "doing well" with the anxiety medication.  (Tr. 967.)  She
was prescribed amitriptyline and directed to stop taking the Zaleplon.  (Tr. 968.)
Finally, on March 12, 2019, she underwent a DLA-20 Mental Health Outcomes
Measurement assessment at Mineral Area Community Psychiatric Rehabilitation
Center, receiving an mGAF score of 39.[3]  (Tr. 870.)

Hutson also saw a urologist, Dr. Kevin Enger, in 2019.  After their initial
appointment, at which she complained of frequent urination, difficulty emptying,
and history of recurrent UTIs (Tr. 1000), she returned for a cystoscopy.  It revealed
severe hydronephrosis on the left side, mild on the right.  (Tr. 1037.)  A left ureteral
stent was placed successfully.[4]  (Tr. 1037.)

---

[3] Her previous DLA-20 was performed on December 17, 2018 and yielded the same score.  (Tr. 904.)

[4] Her caseworker noted that after the procedure, Hutson reported that she was doing well but wanted the stent to be removed soon.  (Tr. 867.)  She was told that she needed to have a renal scan

Finally, Hutson had three pain management appointments with Dr. Nehal Modh.  At her first visit on March 11, 2019, he diagnosed her with low back pain, pain in thoracic spine, cervicalgia, other intervertebral disc degeneration, spondylosis, and contracture of muscle, unspecified site.  (Tr. 1047-48.)  He noted that she presented with "normal mental status, cranial nerves, motor system, sensory system and reflexes."  (Tr. 1048.)  He refilled her Norco prescription and instructed her to return for a follow-up appointment.  (Tr. 1048.)  When she returned on March 25, Dr. Modh noted that her spine flexion was 55 degrees and spine extension was up to 5 degrees.  (Tr. 1044.)  Her gait and stance were normal, as were her psychiatric and neurologic assessments.  (Tr. 1044-45.)  Dr. Modh reviewed the X-rays he had ordered of her cervical and lumbar spine, which showed mild reversal of cervical lordosis; mild cervical degenerative change focused at C5-C6; mild lumbar degenerative changes; left ureteral stent and suspected left nephrolithiasis with bilateral SI joint degenerative changes, greater on the right side.  (Tr. 1051-52.)  She received bilateral transforaminal injections at L3-L4 and L4-L5, as well as a refill of her Norco prescription and a new prescription for Protonix.  (Tr. 1044-46.)  Hutson returned to Dr. Modh's office on April 8, reporting that she did not think the previous injection improved her pain.  (Tr. 1042.)  He again noted that her spine flexion was

---

and bloodwork done to determine how the kidneys were functioning with the stent.  (Tr. 867.)  It appears that the hearing was held before these tests were scheduled.

55 degrees and spine extension was up to 5 degrees.  (Tr. 1043.)  Her gait, stance, and psychiatric and neurologic assessments were all normal.  (Tr. 1043.)  She received a refill of her Norco prescription and was directed to return in a month.  (Tr. 1043.)

### HEARING BEFORE THE ALJ

Huston was 45 years old when she appeared for her hearing before the ALJ on March 26, 2019.  She testified extensively about her living situation and daily activities.  At the time of the hearing, she had been living with a friend, who is on disability, for about eighteen months.  (Tr. 33.)  This friend's in-home health worker comes to the house approximately four times per week and helps with household tasks.  (Tr. 34.)  Hutson's daughter also visits regularly to help her with her laundry.  (Tr. 34.)  Hutson does not do many chores and only prepares simple meals for herself.  (Tr. 34.)  Aside from going to various doctor's appointments, she spends her days at home in her bedroom, watching TV, talking to her kids or her sister, and "just trying to get [her] mental [sic] in check, and stop having panic attacks, and basically trying to just feel better."  (Tr. 35.)  She sometimes has trouble paying attention to the TV.  (Tr. 49.)  She also does not read books because of her difficulty focusing.  (Tr. 51.)  She cannot do most of her hobbies anymore, including sewing, because of her neck pain.  (Tr. 50.)  She does not sleep well because of her back and neck pain, bad dreams, anxiety, and panic attacks.  (Tr. 51.)  As a result, she is often

tired throughout the day and sometimes has to take naps.  (Tr. 53.)  She smokes cigarettes, though less frequently than she used to, because it helps ease her anxiety.  (Tr. 54-55.)  She dresses in simple clothing that is easy to put on.  (Tr. 55.)

Huston also testified about her mental health.  She explained that when she filed her claim, she did not list any mental conditions limiting her ability to work because she had not seen a psychiatrist at that time.  (Tr. 35.)  She began receiving mental health treatment after becoming eligible for Medicaid and now sees a psychiatrist about once a month. (Tr. 35-36.)  A caseworker drives her to these, and other, appointments.  (Tr. 36-38.)   She started taking Cymbalta three weeks before the hearing and was unable to report whether it helped improve her symptoms.  (Tr. 43.)  She reported that her anxiety "still is not in check" and she has panic attacks regularly.  (Tr. 38.)  In addition to Cymbalta, she takes buspirone to help with her anxiety.  (Tr. 38.)  She feels anxious around other people because she does not trust anyone and "always feel[s] like someone is out to hurt [her] mentally or physically."  (Tr. 40.)  She has trouble remembering things and staying focused.  (Tr. 42, 53.)  She does not handle stress well "at all."  (Tr. 53-54.)  When she is angry, she will "start yelling, sometimes even cursing," and crying.  (Tr. 54.)   She avoids public interaction and answering the phone.  (Tr. 54.)

She last worked in 2013 and quit that job to go on the road with her boyfriend at the time, who was a trucker.  (Tr. 40.)  She felt that she "had no choice really to

go on the road with him" because he was abusive to her.  (Tr. 40.)  She was only able to apply for disability when she ended the relationship in August 2017.  (Tr. 41-42.)

As to her physical issues, Hutson was diagnosed with degenerative disc disease, which causes burning and pain in her neck and shoulder.  (Tr. 43-44.)  She also experiences numbness in her shoulder and hands.  (Tr. 55.)  She received injections to help with the pain the day before the hearing.  (Tr. 44.)  She was told it would take several treatments before she sees any improvement in her pain level.  (Tr. 44.)  She cannot stand for more than five minutes before she is "leaning left, right, on [her] feet trying to get the pressure off [her] back."  (Tr. 45.)  Walking around helps alleviate some of the pain, but she still has flank pain from her kidney issues, cramping in her bladder area due to the stent that was placed about a month previously, and kidney stones.  (Tr. 46.)  She also has "severe nausea," stomach ulcers, a hiatal hernia, gastritis, esophagitis, and colitis.  (Tr. 47.)  She has trouble "even just getting up in the morning" because of her nausea.  (Tr. 49.)  She has attacks due to her colitis "a couple times a month," which force her to have to use the restroom four to five times in the morning alone.  (Tr. 56.)  She feels pelvic pressure when she sits and has to shift or get up and down to adjust.  (Tr. 52.)

The ALJ asked Hutson to explain her period of self-employment between 2009 and 2010.  (Tr. 56.)  He then asked Hutson's non-attorney representative for

her opinion regarding Hutson's severe physical impairments.  The representative said that Hutson's impairments were severe, listing chronic arthritic pain in the back, chronic headache pain, fibromyalgia, pelvic congestion, GERD, recurrent UTIs, colitis, SIBS, gastritis, hiatal hernia, peptic ulcer disease, chronic kidney disease, and recent kidney stent placement.  (Tr. 56-57.)  She also explained that the record did not reflect evidence of any treatment prior to 2017/2018 because of Hutson's inability to access healthcare at that time.  (Tr. 57.)

After Hutson's testimony, the ALJ questioned the vocational expert.  He asked whether an individual similar in age, education, and prior work experience to Huston, who is limited to performing light exertion level work; should never climb ladders, ropes, or scaffolds; must avoid all exposure to extreme temperatures; is limited to work at simple, routine, and repetitive tasks, and work environments free of fast-paced quota requirements involving only simple work-related decisions with few, if any, workplace changes; cannot interact with the public; and can only have brief and superficial interaction with coworkers could perform Hutson's past work as a cocktail waitress.  The vocational expert opined that such an individual would be unable to work as a cocktail waitress.  (Tr. 63.)  The ALJ then asked if there were any other jobs in the national or regional economy that an individual with these limitations could perform.  The vocational expert listed three occupations that

comport with these limitations: housekeeper (DOT 323.687-014), office helper (DOT 239.567-010), and mail clerk (DOT 209.687-026).  (Tr. 63-64.)

The ALJ then changed the hypothetical, asking whether there are any jobs in the national or regional economy that could be performed by an individual similar in age, education, and prior work experience to Hutson but who is limited to performing sedentary exertion level work.  The vocational expert offered three occupations that would comport: medical supplies packager (DOT 559.687-014), toy stuffer (DOT 731.685-014), and labeler (DOT 585.685-062).  (Tr. 64-65.)

Hutson's representative also questioned the vocational expert about the average number of breaks and sick days permitted in most jobs.  (Tr. 65-66.)

## ALJ DECISION

The ALJ found that Huston met the insured status requirements of the Social Security Act through March 31, 2018 and had not engaged in substantial gainful activity since January 1, 2014.  (Tr. 12.)  The ALJ then determined that while Hutson suffered from degenerative disc disease and posttraumatic stress disorder (PTSD), these impairments did not meet or medically equal the severity of one of or a combination of the listed impairments in 20 C.F.R. § 404.  (Tr. 13.)

Based on his consideration of the record, the ALJ found that Hutson had an RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) but with the following limitations: she can occasionally balance, bend, stoop, crouch,

kneel, and climb ramps and stairs; she can never climb ladders, ropes, and scaffolds; she can perform simple, routine, and repetitive tasks in a work environment free of fast paced quota requirements involving only simple work related decisions; she can have few if any work place changes; she cannot work with the public; and she can only have brief and superficial interaction with coworkers.  (Tr. 15.)  Based on Huston's RFC, the ALJ found that she could not perform her past relevant work as a cocktail waitress.  (Tr. 19.)  However, the ALJ found that Hutson could perform other jobs in the national economy, including housekeeper, office helper, and mail clerk.  (Tr. 19-20.)   Accordingly, the ALJ denied Hutson's applications because he found that Hutson was not under a disability as defined in the Social Security Act.

## ANALYSIS

### I.   The ALJ adequately considered Hutson's subjective pain complaints.

The ALJ found that Hutson's statements about her pain were not entirely consistent with the objective medical evidence in the record.  (Tr. 16.)  Hutson disagrees, arguing that Dr. Burchett's consultative exam, which the ALJ relied upon in his analysis, did not provide an RFC and in fact supports her subjective pain complaints.  She further contends that the record overall "reflect[s] an individual with continuous complaints of pain throughout her back and in her abdomen."

When evaluating evidence of pain or other subjective complaints, the ALJ is never free to ignore the subjective testimony of the claimant, even if it is

uncorroborated by objective medical evidence.  Basinger v. Heckler, 725 F.2d 1166, 1169 (8th Cir. 1984).  The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole.  See Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990).   In considering the subjective complaints, the ALJ is required to consider whether a claimant's subjective complaints are consistent with the medical evidence.  See Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) (listing factors such as the claimant's daily activities, the duration, frequency, and intensity of the pain, precipitating and aggravating factors, dosage, effectiveness and side effects of medication, and functional restrictions).[5] When an ALJ gives good reasons for the findings, the court will usually defer to the ALJ's finding.  Casey v. Astrue, 503 F.3d 687, 696 (8th Cir. 2007).  However, the ALJ retains the responsibility of developing a full and fair record in the non-adversarial administrative proceeding.  Hildebrand v. Barnhart, 302 F.3d 836, 838 (8th Cir. 2002).

---

[5] This was once referred to as a credibility determination, but the agency has now eliminated use of the term "credibility" to clarify that subjective symptom evaluation is not an examination of an individual's character.  However, the analysis remains largely the same, so the Court's use of the term credibility refers to the ALJ's evaluation of whether a claimant's "statements about the intensity, persistence, and limiting effects of symptoms are consistent with the objective medical evidence and other evidence of record."  See SSR 16-3p, 2017 WL 5180304, at *8 (Oct. 25, 2017); 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3); Lawrence v. Saul, 970 F.3d 989, 995 n.6 (8th Cir. 2020) (noting that SSR 16-3p "largely changes terminology rather than the substantive analysis to be applied" when evaluating a claimant's subjective complaints).

Hutson argues that because the ALJ chose to disregard her testimony about her pain, he was required to make an express credibility determination and had to discuss the factors enumerated in Polaski.  As the Commissioner correctly points out, an ALJ does not need to explicitly discuss every Polaski factor in his decision. Bryant v. Colvin, 861 F.3d 779, 782 (8th Cir. 2017) (citations omitted).  Here, it is clear that the ALJ "used numerous facts to assess [Hutson's] credibility" before ultimately finding that the objective evidence in the record was not consistent with her subjective complaints.  Id.

The record supports the ALJ's finding.  While Hutson did report anxiety and/or depression at several appointments (Tr. 505, 879, 898, 901, 925, 941, 943, 958, 963), she frequently reported that she was doing well.  (Tr. 864, 867, 868, 887, 898, 913, 916, 928, 935.)  Most of the records show normal psychiatric exams, and she regularly presented with an appropriate demeanor, mood, and orientation.  (Tr. 275, 318-19, 332, 353, 410, 467, 483, 506, 697-98, 962)  Moreover, it appears that conservative treatment has helped manage her symptoms.  See Lawrence, 970 F.3d at 996 (ALJ's conclusions as to the severity of pain and limitations consistent with fact that claimant was prescribed generally conservative treatment).  For example, on one occasion when Hutson reported feeling increased anxiety, she attributed it to the fact that she did not have refills of her buspirone prescription for a few days.  (Tr. 901.)  This indicates that she finds the medication helpful in controlling her

symptoms.  Though she reported that she was still experiencing anxiety at one of her visits with Mr. Chambers, she also said that she was "doing a little bit better" overall and that she was "doing well" with the anti-anxiety prescriptions.  (Tr. 962, 967.) She also reported that her depression was not as bad as it once was and she "feels like it is balanced now."  (Tr. 925.)

Similarly, the record supports the ALJ's finding that Hutson does not suffer from debilitating back pain.  She consistently exhibited a "normal" gait and full musculoskeletal range of motion and did not appear to have trouble walking or moving.  (Tr. 353, 366, 386, 410, 412, 432, 467, 506-07, 698, 1043, 1044-45, 1047-48.)  The most recent MRI of her spine showed normal results.  (Tr. 482.)  Her most recent X-rays showed "mild" cervical and lumbar degenerative changes.  (Tr. 1051-52.)  As the ALJ noted, the consultative exam performed by Dr. Burchett further supports a finding of non-debilitating back pain.  (Tr. 16-17, 410, 412.)

To the extent that Hutson contests the ALJ's determination that her abdominal and gastrointestinal diagnoses did not qualify as severe impairments, the record also supports that finding.  She told Dr. Burchett that the antibiotics and other medicines she received "resolved" her problems (Tr. 409.)   She did not ever see a gastroenterologist for treatment.  (Tr. 409.)   Her colonoscopy and upper GI endoscopy in 2018 revealed non-bleeding internal hemorrhoids (Tr. 699), a small

hiatal hernia, non-severe esophagitis, gastritis, and non-bleeding gastric ulcers (Tr. 700), findings which apparently warranted only conservative treatment.[6]

Finally, despite Hutson's hearing testimony that she could not do many tasks because of her pain, notes from her December 17, 2018 and March 12, 2019 DLA-20 assessments indicated that she does tasks like laundry, "appropriately interacts in the community," and has "several leisure activities that she enjoys to do [sic] and does participate in those without prompts."  (Tr. 870, 904.)  At various times throughout the record, Hutson reported, among other activities, playing games, socializing with family, cleaning her house, cooking meals, and hosting a yard sale. (Tr. 898, 901, 910, 913, 928, 941, 945-52.)  This evidence undercuts Hutson's claims of debilitating pain and supports the ALJ's credibility determination.  See Medhaug v. Astrue, 578 F.3d 805, 817 (8th Cir. 2009) ("Acts such as cooking, vacuuming, washing dishes, doing laundry, shopping, driving, and walking, are inconsistent with subjective complaints of disabling pain.").

## II.   The RFC is supported by some medical evidence.

Hutson also argues that the ALJ erred in formulating her RFC because the record did not contain "a single physical or mental residual functional capacity evaluation or opinion from an acceptable medical source" upon which the ALJ could

---

[6] After these procedures, Hutson was directed to follow an anti-reflux regiment, change her diet, and avoid tobacco.  The record indicates that she continued smoking.

have relied to determine her disability.  She believes that the ALJ "improperly drew inferences from the medical reports," and that he formulated the RFC based on his own impermissible interpretation of the evidence, which she contends does not support the ability to perform light work.

The Social Security regulations expressly state that the ALJ is "responsible for assessing residual functional capacity."  20 C.F.R. § 404.1546(c), 416.946(c). See also Winn v. Comm'r, Soc. Sec. Admin., 894 F.3d 982, 987 (8th Cir. 2018).  In making this determination, the ALJ must consider "all the relevant evidence in [the claimant's] case record."  20 C.F.R. § 404.1545(a)(1).  While the ALJ does have a duty to fully and fairly develop the record, he is not required to obtain additional medical evidence if the evidence of record provides a sufficient basis for the ALJ's decision.  Martise v. Astrue, 641 F.3d 909, 926-27 (8th Cir. 2011).

Hutson is correct that "an ALJ may not draw upon his own inferences from medical reports" in formulating an RFC.  Dixon v. Barnhart, 324 F.3d 997, 1002 (8th Cir. 2003).  However, she appears to suggest that an ALJ cannot formulate an RFC if there are no medical opinions or consultative exams in the record.  But "[t]here is no requirement that an RFC finding be supported by a specific medical opinion."  Hensley v. Colvin, 829 F.3d 926, 932 (8th Cir. 2016).  In fact, "[i]n the absence of medical opinion evidence, 'medical records prepared by the most relevant

treating physicians [can] provide affirmative medical evidence supporting the ALJ's residual functional capacity findings.'" Id. (quoting Johnson, 628 F.3d at 995).

The ALJ accounted for Hutson's degenerative disc disease by imposing light exertional restriction and postural and climbing limitations. (Tr. 18.)  He accounted for her PTSD and related mental health symptoms by imposing restrictions relating to meeting quota requirements, making work-related decisions, having workplace changes, and interacting with others.  (Tr. 18, 40, 42, 53, 54.)  These limitations on Hutson's abilities are consistent with the evidence submitted about her degenerative disc disease.  The record demonstrates that she received generally conservative treatment for her back pain, with the most aggressive treatment consisting of transforaminal injections at L3-L4 and L4-L5 in March 2019 (Tr. 1044-45); that her MRI and X-ray results were normal or revealed "mild" degenerative changes; and that she consistently presented in an ambulatory condition, without any indications that she had trouble walking or moving.  The limitations are also consistent with the evidence concerning her mental health, including Hutson's own hearing testimony. (Tr. 38, 40, 42, 53, 54.)  It is ultimately the claimant's burden to establish her RFC, and Hutson failed to carry this burden by producing any evidence that her RFC should be more limited.  Hensley, 829 F.3d at 932.

Although Hutson believes that the ALJ should have assessed the medical evidence differently to support greater limitations, it is not my role to reweigh the

evidence considered by the ALJ in his determination of a plaintiff's RFC.  Id. at 934. Here, the ALJ did not substantially err when he concluded, based on the evidence in the record, that Hutson had the RFC to perform light work with certain limitations. Additionally, the record reflects that he considered her subjective complaints when fashioning her RFC, even though he did not find them entirely consistent with the objective evidence submitted.

The written decision demonstrates that the ALJ evaluated all of the medical evidence of record and adequately explained his reasons for the weight given this evidence in a manner consistent with the regulations.  Substantial evidence in the record as a whole supports the ALJ's RFC determination, so I will affirm the decision of the Commissioner as within a "reasonable zone of choice."  Fentress v. Berryhill, 854 F.3d 1016, 1021 (8th Cir. 2017) (citing Owen v. Astrue, 551 F.3d 792, 798 (8th Cir. 2008)).

Accordingly,

**IT IS HEREBY ORDERED that** the decision of the Commissioner is affirmed, and Tammy Hutson's complaint is dismissed with prejudice.

A separate Judgment is entered herewith.

_____
RODNEY W. SIPPEL
UNITED STATES DISTRICT JUDGE

Dated this 13th day of September, 2021.